# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

CARFAX, INC.,

                                          Plaintiff,

            vs**.**                                          NO. 1:19-CV-01375-RDA-IDD

PRIMERITUS FINANCIAL SERVICES, INC.,                **JURY TRIAL DEMANDED**
ROQUEMORE HOLDINGS LLC D/B/A
ROQUEMORE & ROQUEMORE,
RENAISSANCE RECOVERY SOLUTIONS, and
USA RECOVERY HOLDINGS, INC.,

                                          Defendants.

## FIRST AMENDED COMPLAINT

As permitted by the Court's order (Doc. 27), Plaintiff, Carfax, Inc. ("Carfax"), hereby files

this First Amended Complaint and alleges as follows:

## NATURE OF ACTION

1.      This is an action based upon: (1) The Computer Fraud and Abuse Act, 18 U.S.C.

§ 1030; (2) the Virginia Uniform Computer Information Transactions Act, Va. Code § 59.1-509.2,

*et seq.*, (3) the Virginia Computer Crimes Act, Va. Code § 18.2 – 152.1, *et seq.*, (4) Breach of

Contract, (5) Unjust Enrichment, and (6) Trespass to Chattels.  Carfax seeks injunctive and other

equitable relief and damages, as well as punitive damages.

## PARTIES

2.      Plaintiff Carfax is a corporation duly organized and existing under the laws of

Pennsylvania, having its headquarters and principal place of business in Centreville, Virginia.  Carfax

is a wholly owned subsidiary of IHS Markit Ltd., based in London, England.

1

3.    Defendant Primeritus Financial Services, Inc. ("Primeritus") is legally organized under the laws of Delaware, with its principal place of business in Nashville, Tennessee.  The other defendants are affiliates of Primeritus.  Upon information and belief, Primeritus owns or controls the other defendants and has assumed the contractual rights and obligations of the other defendants that are at issue in this action.

4.    Defendant Roquemore Holdings LLC d//b/a Roquemore & Roquemore ("Roquemore") is legally organized under the laws of Delaware, with its principal place of business in Nashville, Tennessee.  Roquemore's business operations originated in the state of Texas, but on information and belief, Primeritus acquired Roquemore in 2016.  On Primeritus' website, https://www.primeritus.com/, Roquemore is identified as one of Primeritus' "Family of Companies."

5.    Defendant Renaissance Recovery Solutions, LLC ("Renaissance") is legally organized under the laws of Delaware, with its principal place of business in Nashville, Tennessee.  Renaissance's business operations originated in the state of Michigan, but on information and belief, Primeritus acquired Renaissance in or around 2010.  On information and belief, Renaissance's business operations were "rolled up" into Primeritus, which continues to operate that business as its own.

6.    Defendant USA Recovery Holdings, Inc., formerly known as "USA Recovery Solutions" ("USA Recovery") is legally organized under the laws of Delaware, with its principal place of business in Nashville, Tennessee.  USA Recovery's business operations originated in the state of California, but on information and belief, Primeritus acquired USA Recovery in or around 2012.  On information and belief, USA Recovery's business operations were "rolled up" into Primeritus, which continues to operate that business as its own.

7.      Together, Primeritus, Roquemore, Renaissance, and USA Recovery are referred to as "Defendants."  A principal component of Defendants' business is "skip tracing"—that is, the location of cars for repossession by secured lenders.  Primeritus describes its business as follows: Primeritus "provide[s] our lender clients with value-added, outsourced repossession management and skip tracing services. We are neither a repossession agency nor a repossession agent. We leverage a national network of independent, certified and licensed repossession agents and unique investigative techniques to quickly and reliably secure our client's collateral."[1]

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises out of Defendants' violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Court has subject matter jurisdiction over Plaintiff's claims under the Virginia Uniform Computer Information Transactions Act, Va. Code § 59.1-501.1, *et seq.*, the Virginia Computer Crimes Act, Va. Code § 18.2 – 152.1, *et seq.*, Breach of Contract, Unjust Enrichment, and Trespass to Chattels pursuant to 28 U.S.C. § 1367.

9.      The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy is over $75,000 and the parties are incorporated and have their headquarters in different states.

10.      This Court has specific personal jurisdiction over Defendants by virtue of the business activities Defendants conduct within the Commonwealth of Virginia, resulting in sufficient minimum contacts with this forum.  USA Recovery, Renaissance, and Roquemore entered into written contracts with Carfax (Exhibits A - F), which are binding and enforceable against them and Primeritus, and each included a valid and enforceable forum selection clause,

---

[1]  https://www.primeritus.com/ (visited April 25, 2020).

pursuant to which Defendants have consented to the jurisdiction of the courts of Virginia. Defendants also have committed tortious acts in or outside of Virginia that have injured Carfax in Virginia. Defendants also engage in other conduct availing themselves of the privilege of conducting business in Virginia, and Defendants regularly do or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered, in Virginia by providing services to Virginia-based lender clients and utilizing Virginia-based repossession agents. Upon information and belief, a substantial number of the Defendants' myCARFAX transactions with Carfax that are at issue were for Virginia-based lender clients, involved the retention of Virginia-based repossession agents, or resulted in the repossession of a car in Virginia.

11.     Venue is proper under 28 U.S.C. § 1391(b) in the Eastern District of Virginia because a substantial part of the actions or omissions giving rise to Plaintiff's claims occurred in this judicial district, including the injuries and damages sustained by Carfax, and because a substantial portion of the property (data) that is the subject of Plaintiff's claims is situated in, and was accessed in, this judicial district.

12.     Venue also is proper under 28 U.S.C. § 1391(c) in the Eastern District of Virginia because Defendants are subject to personal jurisdiction in this judicial district.

13.     Venue and jurisdiction in this Court is also proper because Defendants are bound by the Terms of Use contractual agreement for myCARFAX, which states "you and CARFAX agree that jurisdiction and venue for all matters relating to these Terms of Use shall be vested

exclusively in the state courts in Fairfax County, Virginia, or the U.S. District Court for the Eastern District of Virginia, Alexandria Division."[2]

## **FACTUAL BACKGROUND**

14.     Carfax was founded in 1984 for the purpose of collecting odometer readings in order to help car dealers avoid odometer fraud.  Soon after, Carfax expanded its information collection to include additional vehicle history information and, by 1993, it collected title information from nearly all 50 states.  In subsequent years, Carfax invested significant resources into building business relationships with data providers to expand upon the data included in its Vehicle History Reports.

15.     As a data company, Carfax collects, aggregates, distributes, and sells vehicle history information to buyers and sellers of used cars and light trucks.  Carfax collects vehicle history information from over 113,000 third-party sources with which it has relationships, including motor vehicle agencies, rental and fleet vehicle companies, consumer protection agencies, state inspection stations, fire and police departments, manufacturers, inspection companies, service and repair facilities, among others. Today, Carfax is the leading provider of vehicle history data with more than 24 billion data records for vehicles in the U.S. and Canada.  Carfax collected this data over many years, through enormous effort and expense. Carfax maintains this data as a proprietary database. Carfax sells and licenses limited access to this data but otherwise protects it from intrusion to maintain its value, which derives from the cost and difficulty of replicating its comprehensive scope.

16.     The vehicle history data collected, organized, and maintained by Carfax is the company's primary source of value.  Accordingly, it has implemented data security features, terms of

---

[2]  As a licensee of third party content, Carfax was required to include, as part of the myCARFAX Terms of Use, an End-User License Agreement between the user (here the Defendants) and MOTOR Information Systems, Hearst Business Publishing, Inc. ("EULA").  The EULA is governed by New York law and venue rests in New York.  The EULA is not at issue here.

use, and legal agreements that all serve to protect Carfax data from being improperly accessed or exploited.

17.     Carfax provides multiple different services and products to a wide array of customers ranging from individual consumers to vehicle dealers to banks to insurance companies, among many others.  Carfax's main product is the Vehicle History Report, which draws upon Carfax's vast database to provide customers with the vehicle history information for a particular vehicle.  Each Vehicle History Report contains vehicle information that is reported to Carfax from its sources.  Such information may include the vehicle's title information, flood damage history, total loss accident history, odometer readings, number of owners, service history, and accident or damage indicators, among other information.

18.     Over the years, Carfax has offered various data services and products at various prices to commercial and individual vehicle owner customers.  Currently, for example, an individual Vehicle History Report may be purchased by customers for personal use for $39.99.

19.     In 2005, Renaissance took advantage of a special offer for commercial customers in the banking and insurance industry and entered into a contract to purchase Vehicle History Reports from Carfax at promotional pricing with a minimum commitment each month (Exhibit A).  The original terms and conditions of that contract (Exhibit B) was entered into by Shirley Marks, Renaissance's Director of Skip Tracing, and included numerous provisions pertinent to this action, among them being automatic renewals, the ability for Carfax to adjust pricing and change terms and conditions over time, and the customer's consent to jurisdiction in the courts of Virginia.  That contract has been automatically renewed each year since 2005 and is still binding, enforceable and in use today.  Primeritus has succeeded to the rights and obligations in this contract and continues to purchase Vehicle History Reports from Carfax pursuant to this contract.

20.     In 2008, USA Recovery took advantage of a special offer for commercial customers in the banking and insurance industries and entered into a contract to purchase Vehicle History Reports from Carfax at promotional pricing with a minimum commitment each month (Exhibit C).  The original terms and conditions of that contract (Exhibit D) was entered into by Bill Sheehan, Operations Manager of USA Recovery, and included numerous provisions pertinent to this action, among them being automatic renewals, the ability for Carfax to adjust pricing and change terms and conditions over time, and the customer's consent to jurisdiction in the courts of Virginia.  This contract has been automatically renewed each year since 2008 and is still binding and enforceable and in use.  Primeritus has succeeded to the rights and obligations in this contract and continues to purchase Vehicle History Reports from Carfax pursuant to this contract.

21.     In 2010, Roquemore took advantage of a special offer for commercial customers in the banking and insurance industries and entered into a contract to purchase Vehicle History Reports from Carfax at promotional pricing with a minimum commitment each month (Exhibit E). The contract with Roquemore was executed by Mike Postlethwait, the General Manager of Roquemore, and included numerous provisions pertinent to this action, among them being automatic renewals, the ability for Carfax to adjust pricing and change terms and conditions over time, and the customer's consent to jurisdiction in the courts of Virginia.  These contracts have been automatically renewed each year since 2010 and are still binding and enforceable and in use today.  Primeritus has succeeded to the rights and obligations in these contracts and continues to purchase Vehicle History Reports from Carfax pursuant to these contracts.

22.     In each of these instances in 2005, 2008 and 2011, Defendants knew they were negotiating with Carfax employees located in Virginia, contracting with a company headquartered

7

in Virginia and agreeing that the contractual relationship was governed by Virginia law with any

disputes to be handled in Virginia courts.[3]

23.     The terms and conditions of each contract contain a provision to this effect

(emphasis added):

> This agreement (which shall consist of the front page hereof, these terms and conditions and any exhibits or addenda hereto, hereinafter the "Agreement") is effective from the date on which it is accepted by CARFAX and shall remain in force for the period of time identified on the front page of this Agreement (the "Term"). ***This Agreement shall automatically renew for additional one-year periods*** unless either party gives the other party written notice of its intention to terminate this Agreement thirty (30) days prior to the anniversary date. Alteration by CARFAX of any specific service or Customer's failure to order additional services hereunder shall not terminate this Agreement, ***it being the intent of the parties for this Agreement to remain in effect in the event of future orders for service***. CARFAX reserves the right to change the VHS pricing and terms and conditions at any time.

### THE MYCARFAX SERVICE

24.     In 2012, Carfax introduced its myCARFAX service specifically designed for

personal vehicle owners.  To access data through this service either on the myCARFAX website

or through the myCARFAX mobile app, a vehicle owner must create an account (including an

email address and password) and input the Vehicle Identification Number ("VIN") of his or her

car, which then allows the vehicle owner to obtain the vehicle's prior service history reported to

Carfax.  Vehicle owners may also use myCARFAX to track their vehicle's service history

(including oil changes and other routine maintenance), receive automatic service alerts reminding

them to perform routine maintenance, research service and repair costs and obtain critical

---

[3]   In addition to the three currently active, binding and enforceable contracts, Defendants negotiated several other contracts with Carfax over the years, including contracts executed in 2013, 2014, 2015 and 2018.  There was a longstanding, multi-faceted business relationship between Defendants and Carfax, and Defendants were well aware they were doing business with a Virginia company and availing themselves of various Virginia products and services.

information about open safety recalls.  Vehicle owners may also use myCARFAX to locate a service provider or provide a rating and review of a service provider's services.

25.     While vehicle owners are not required to pay a fee to use myCARFAX, Carfax derives valuable benefits from vehicle owners who use the service.  For example, by creating a myCARFAX account, vehicle owners may submit data about their own vehicle that Carfax may not already have from other sources.  Vehicle owners may also provide ratings and reviews for the service providers they use to service their vehicles which helps to inform other users of myCARFAX of reputable service providers.  Vehicle owners who use myCARFAX also send to Carfax valuable leads for service shops not currently included in the myCARFAX service.  In addition, Carfax gains a direct and personal connection to a vehicle owner from which it profits by obtaining data and making recommendations for service providers and used car dealers.

26.     Commencing in 2013, and becoming rampant in 2017 and 2018, approximately 70 of Defendants' employees who perform skip tracing services on Defendants' behalf accessed the myCARFAX service at least 26,142 times to obtain vehicle service histories and other Carfax data for their commercial use to enable car repossessions.  Defendants' employees took these actions within the scope of their employment with either the express or tacit authorization of Defendants.  Moreover, even if unauthorized (which is highly unlikely given that this activity was not conducted by a few rogue employees but by at least 70 of Defendants' employees), through their employees' actions, Defendants avoided paying for Vehicle History Reports to which they had agreed, and then Defendants' retained the benefits of their employees' unlawful actions without compensating Carfax. Defendants' employees accessed data through the myCARFAX service by falsely representing that they were personal vehicle owners using the myCARFAX service for personal use, creating fictitious accounts, and inputting the VINs of cars they did not own, all to obtain Carfax data about a car the

Defendants were trying to locate for a lender client.  Each of these accesses to the Carfax databases through the myCARFAX service under false pretenses was unlawful and accessed data in violation of state and federal law. Moreover, each of these accesses to the myCARFAX service was an "order for service" under the three contracts identified above for which Defendants are obligated to pay commercial rates.  Furthermore, Defendants' use the data obtained violated the myCARFAX terms of service as well.

27.     When Defendants' employees began rampantly accessing Carfax data through the myCARFAX service in 2017 and 2018, Defendants knew or should have known that their employees were obtaining Carfax data without paying for it at the contractual commercial rates. Upon information and belief, and it being a reasonable inference from the facts known, thousands of Defendants' employees' queries through the myCARFAX service returned information that Defendants then used for commercial purposes to locate cars for repossession. Had the myCARFAX service not been helpful to Defendants, Defendants' employees would not have used it 26,142 times. Defendants thus benefitted by evading the terms of their commercial contracts with Carfax by encouraging and authorizing—expressly or tacitly—their employees' unlawful access to Carfax data through the myCARFAX service.  However, even if Defendants did not encourage or authorize—expressly or tacitly—their employees' unlawful access to Carfax data through the myCARFAX service, Defendants nonetheless retained the benefit of the data obtained, saved the costs of paying the commercial rates for additional orders of services to which Defendants had agreed under the three contracts noted above, and used the ill-gotten data to earn revenues for their repossession services, including earning substantial revenues from transactions with a connection to Virginia.

28.     Upon information and belief, a substantial number of the lender clients, cars, and repossession agents involved in the 26,142 myCARFAX transactions at issue were located in Virginia, and Defendants thus earned substantial revenue from Virginia-connected transactions.

29.     A commercial entity, such as skip-tracers like Defendants, that unlawfully access Carfax data through the myCARFAX service by creating fictitious accounts, provide no reciprocal benefit to Carfax because those skip tracers do not own the vehicle at issue, do not provide additional data about the vehicles at issue or enter ratings and reviews of service providers, and are not the target of communications from Carfax recommending service providers or used car dealers. Therefore, Defendants provided no benefit or value to Carfax in exchange for their access to the myCARFAX service or for the data they obtained from myCARFAX.

30.     The same data provided to vehicle owners as part of the myCARFAX service, including service data, is provided to other customers, including commercial entities, as part of Carfax's other services. Those services, however, are only available to paying customers and are not provided for free to commercial entities. For example, a business, such as one of the Defendants, could obtain the service history for a vehicle (and thereby attempt to ascertain the location of the vehicle) by purchasing a Vehicle History Report for the vehicle.

31.     The webpage and initial information screen for myCARFAX are explicit that the product is designed for individual, personal vehicle owners. It states in large type: "Taking care of **your car** is easier than ever" and "View **your vehicle** history." (Emphases added)



32.     The myCARFAX website also repeatedly uses the phrase "your car" in reference to the product's intended uses by vehicle owners:



33.     To use myCARFAX, a vehicle owner must first register to create a personal account.   The registration window notifies registrants that "[b]y creating a FREE account, you agree to the Terms of Use and Privacy Statement."   The phrases "Terms of Use" and "Privacy

Statement" are blue hyperlinks that bring the user to a terms of use agreement titled "CARFAX Consumer Terms of Use."  The first page of the agreement, in conspicuous font, states:

> BY VISITING THE SITE, OR ANY PAGE OF THE SITE, AND/OR BY USING ANY CARFAX SERVICE (AS DEFINED BELOW) YOU DEMONSTRATE THAT (I) YOU HAVE READ THESE TERMS OF USE, (II) YOU UNDERSTAND THEM AND (III) **YOU AGREE AND ACKNOWLEDGE THAT THESE TERMS OF USE CONSTITUTE A BINDING CONTRACT BETWEEN YOU AND CARFAX AND YOU WILL COMPLY WITH AND BE BOUND BY THESE TERMS OF USE,** WHETHER OR NOT YOU CREATE A CARFAX ACCOUNT. IF YOU DO NOT AGREE TO THESE TERMS OF USE, PLEASE DO NOT USE THE SITE. IF YOU DO NOT AGREE TO ALL OF THESE TERMS OF USE, YOU MAY NOT CREATE A CARFAX ACCOUNT OR ACCESS OR USE ANY SITE OR ANY PART OF THE CARFAX SERVICE(S).

(Exhibit F) (emphasis added).

34.     The Terms of Use also state that "By creating an account, you represent and warrant to CARFAX that (i) you are over the age of eighteen (18) and have the power and authority to enter into and perform the obligations under these Terms of Use, (ii) **you own the vehicles for which you are using the myCARFAX Service** . . ." (emphasis added).

35.     The Terms of Use go on to state:

(a) "The myCARFAX Service is a **personal vehicle** information management service that allows you to consolidate and track information about **your vehicles**." (Emphasis added)

(b) "You are hereby granted a limited, revocable, non-exclusive and non-transferable license to access and use the myCARFAX Service in the United States solely for your **personal use** and only in accordance with these Terms of Use." (Emphasis added).

36.     In addition to expressly restricting the use of myCARFAX to vehicle owners for personal use, the Terms of Use, in a section titled "Restrictions on Access and Use" also explicitly forbid the use of myCARFAX for commercial purposes:

> a.   "CARFAX offers you access to the Service(s) solely for your own personal and non-commercial use.  You may not resell or make any commercial use of any Service(s)."

> b.   "Except as otherwise expressly permitted under these Terms of Use or copyright law, no copying, redistribution, retransmission, publication or

commercial exploitation of Services will be permitted without the express written permission of CARFAX or the copyright owner."

c. "You SHALL NOT . . . act as a service bureau . . . "

37.    The agreement similarly forbids the systemic retrieval of data and related data compilation activities:

d. "You SHALL NOT . . . engage in . . . any other practice or activity the purpose of which is to obtain lists of vehicles, portions of a database or other lists or information in or from any Services . . . ."

e. "Systematic retrieval or use of the Service or any data from the Site to create or compile, directly or indirectly, in whole or in part, a collection, compilation, database or directory without the express written permission of CARFAX is strictly prohibited."

38.    The Terms of Use forbid the user to "use, or allow the use of, any Services in contravention of these Terms of Use or any federal, state, local, foreign or other applicable laws, rules or regulations . . . ."

39.    Defendants have engaged in an ongoing company-wide scheme to avoid paying for Carfax vehicle history data by unlawfully using the myCARFAX service to access vehicle history data for vehicles the Defendants are working to repossess on behalf of lenders and loan holders. Defendants' employees pretended to be the vehicle owners, registered for fictitious "personal" myCARFAX accounts with their business email addresses (or other phony email addresses like carfaxreports2016@yahoo.com to circumvent detection), and falsely implied their ownership of the vehicles whose VINs were used to obtain data, intending to use the data obtained through the myCARFAX service for commercial purposes.   In so doing, Defendants have violated the myCARFAX Terms of Use to which its employees expressly agreed when registering with myCARFAX.

40.    Defendants' employees unlawfully used myCARFAX by inputting the VIN (or license plate and state) of a vehicle that they do not own but instead have been assigned (and are

being paid) to help repossess.   The myCARFAX service then accesses Carfax's proprietary databases to retrieve the vehicle's service history, which provides Defendants with information that may be used to track the vehicle to a geographic area.

41.     The scope of Defendants' ongoing scheme is extensive.   Over the course of several years, at least 70 employees of Defendant have registered multiple fictitious accounts and used myCARFAX to unlawfully, and without authorization, access the data at least 26,142 times. Attached to this First Amended Complaint (Exhibit G) is a sample of Defendants' unauthorized access into the myCARFAX database, providing the date and time of each such instance.

42.     At the price of $39.99 each, the total cost of 26,142 Vehicle History Reports would be $1,045,418.58, which reflects the lost revenue to Carfax had these Vehicle History Reports been purchased lawfully.   Moreover, had Defendants paid the full commercial rates they had agreed to pay, these orders for services to obtain Carfax data would have cost hundreds of thousands of dollars.   Given the significant cost savings to Defendants by this unlawful scheme, one may reasonably infer that Defendants authorized, encouraged, or tacitly approved of this unlawful scheme.   Even if Defendants were unaware of their employees' conduct (which seems implausible given the number of employees engaged in this unlawful activity, the duration, and the benefits derived by Defendants), Defendants nonetheless accepted and retained the benefits of this scheme and are liable to reimburse Carfax for the value of  these 26,142 queries through the myCARFAX service.

43.     A small sample of Defendants' unauthorized usage, shown in Exhibit G, highlights the egregious nature of the fraud and unauthorized access.   In just one day, one of the Defendants' employees entered seven VINs over the course of three hours.   This demonstrates a scheme of systemic data collection central to Defendants' commercial activities.   On any given day, as many

as 19 employees of Defendant have used the myCARFAX service to unlawfully access vehicle history data.

44.     The repeated, systemic, and longstanding use of myCARFAX by Defendants' employees, who were acting within the scope of their employment, and the resulting significant cost savings experienced by Defendants while not paying commercial rates for the data, establishes that Defendants knew or should have known of their employees' unlawful use of myCARFAX as a valuable tool for the location of vehicles to be repossessed.

45.     Defendants also knew that the activities of its employees were unlawful for at least one additional reason.  Primeritus or one of its affiliates has had a commercial contract at least since 2005 to purchase data from Carfax specifically for performing skip-tracing services.  The 2005 contract was signed by the Director of Skip Tracing.  Thus, Primeritus is well aware that Carfax sells data to commercial entities engaged in the business of skip tracing.

46.     On January 22, 2019, Carfax sent a cease and desist letter to Defendant demanding that Defendant terminate its pattern and practice of unauthorized commercial use of myCARFAX data.  A copy of this letter is attached (Exhibit H**)**.  The letter stated: "Our records show that rather than pay for Carfax's data, Primeritus stole the data for at least 26,142 vehicles . . . ."[4]

47.     The repeated, systemic, and longstanding unauthorized use of myCARFAX by Defendants' employees was (a) for the benefit of Defendants' business activity of repossessing vehicles and (b) within the scope of the employees' job responsibilities.

48.     Defendants are responsible for the unlawful and unauthorized use by its employees acting within the scope of their responsibilities.  Therefore, Defendants are liable in tort to Carfax

---

[4]  In response, Defendants threatened to take away its current legitimate business with Carfax, indicating that Carfax must put up with Defendants' theft if it wanted to keep Defendants as customers.

under the doctrine of *respondeat superior*, are liable in contract under the doctrines of acquiescence or actual or express authority, and are liable in equity under the doctrine of unjust enrichment.

49.     In conjunction with its cease and desist letter, Carfax prepared an invoice for the 26,142 instances of unauthorized access uncovered by Carfax's investigation.  Using a reduced rate of only $18.99 per Vehicle History Report, Carfax calculated a total of $496,436.58 owed to Carfax.  This invoice was sent to Defendants as an offer of compromise with the cease and desist letter on January 22, 2019.

50.     Defendants have refused to pay the invoice and, upon information and belief, failed to cease its unauthorized access of the myCARFAX service, with unauthorized access occurring after the date of Carfax's cease and desist letter.

51.     By unlawfully accessing and exploiting Carfax's proprietary data, Defendants caused damage to Carfax.  The damage includes, but is not limited to: (1) lost contract revenue and lost profits from thousands of unlawfully obtained data vehicle profiles, (2) the diminution in value of Carfax's proprietary information, (3) the cost of investigating Defendants' wrongdoing, and (4) an increased burden on Carfax's information technology systems and databases.

52.     Defendants' unlawful conduct gives rise to the following causes of action:

<u>**COUNT I**</u>
**Computer Fraud and Abuse Act (18 U.S.C. § 1030)**

53.     Carfax incorporates the allegations in paragraphs 1 through 51 as if set forth herein.

54.     The Carfax computer systems are a protected computer used in or affecting interstate commerce or communication, and were the same systems accessed by Defendants and

their employees to view, download, copy, or otherwise unlawfully access Carfax's proprietary information.

55.     The protected computer is a high-speed data processing device that performs logical, arithmetic, or storage functions, including a data storage facility working in conjunction with the protected computer.

56.     Defendants, through their employees, knowingly and intentionally accessed Carfax's protected computer by creating fictitious accounts and submitting queries using VINs that they falsely represented as the VINs of their own vehicles, which was without authorization or in excess of any authorization granted by Carfax, and Defendants' employees thereby obtained information from the protected computer by intentionally viewing, downloading, copying and/or otherwise unlawfully accessing proprietary information in a transaction involving interstate commerce or communication.  18 U.S.C. § 1030(a)(2)(c).

57.     Defendant knowingly and with intent to defraud accessed Carfax's protected computer and database through the myCARFAX service without authorization or in excess of authorization and thereby obtained data of great value used to further the fraud in violation of 18 U.S.C. § 1030(a)(4).

58.     Defendants knowingly and intentionally accessed a protected computer without authorization and, as a result of such conduct, caused damage and loss including, but not limited to: (a) causing Carfax to incur substantial costs, including, but not limited to, the cost of investigating the unauthorized access and conducting a damage assessment, (b) causing Carfax to incur the cost of responding to the unauthorized access, (c) lost revenue to Carfax, (d) imposing undue burdens on Carfax's protected computer systems and databases, and (e) impairing the

integrity, unique and proprietary value, and confidentiality of Carfax's proprietary data located on

Carfax's protected computer.  18 U.S.C. § 1030(a)(5)(c).

59.     At its headquarters in Virginia, Carfax employees devoted countless hours sorting

and compiling information about these 26,142 queries to determine the sources of the queries and

to determine who was responsible for these unauthorized queries.  These tasks were made more

difficult because Defendants' employees created numerous fictitious accounts over the course of

five years.  The nature and extent of Defendants' employees' unlawful actions delayed Carfax's

discovery of this scheme until shortly before January 2019, when it sent the cease and desist letter

to Defendants.

60.     As a result of Defendants' 26,142 unlawful queries, Carfax has sustained aggregate

losses in excess of $5,000 in value during a one-year period, including the cost of responding to

and investigating these 26,142 unlawful queries and conducting a damage assessment.

61.     Carfax seeks damages under 18 U.S.C. § 1030(g) in an amount to be proven at trial.

62.     As a direct result of Defendants' actions, Carfax has suffered and continues to

suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue

unless Defendants' actions are enjoined.

## COUNT II
## Breach of Contract

63.     Carfax incorporates the allegations in paragraphs 1 through 61 as if set forth herein.

64.     The 2005 contract between Renaissance and Carfax (Exhibits A & B), which is

binding on Primeritus, contains a provision stating that "Customer's failure to order additional

services hereunder shall not terminate this Agreement, it being the intent of the parties for this

Agreement to remain in effect in the event of future orders for service."  The 26,142 queries by

Defendants' employees to access Carfax's vehicle history data constitutes "orders for service"

under the 2005 contract, for which Primeritus and Renaissance are obligated to pay the full contract rate for each "order for service."

65.     The 2008 contract between USA Recovery and Carfax (Exhibits C & D), which is binding on Primeritus, contains a provision stating that "Customer's failure to order additional services hereunder shall not terminate this Agreement, it being the intent of the parties for this Agreement to remain in effect in the event of future orders for service."  The 26,142 queries by Defendants' employees to access Carfax's vehicle history data constitutes "orders for service" under the 2008 contract, for which Primeritus and USA Recovery are obligated to pay the full contract rate for each "order for service."

66.     The 2010 contract between Roquemore and Carfax (Exhibit E), which is binding on Primeritus, contains a provision stating that "Customer's failure to order additional services hereunder shall not terminate this Agreement, it being the intent of the parties for this Agreement to remain in effect in the event of future orders for service."  The 26,142 queries by Defendants' employees to access Carfax's vehicle history data constitutes "orders for service" under the 2010 contract, for which Primeritus and Roquemore are obligated to pay the full contract rate for each "order for service."

67.     Under any one, or all three of these contracts, Primeritus and one or more of its affiliates, are liable to pay for each of the 26,142 "orders for service" now at issue, at the contract rate then in effect for each order (which varied over time from 2013 to 2018).  The exact amount has not yet been calculated, but Carfax seeks contract damages of at least $500,000.00 plus prejudgment interests from the dates each payment was due and owing and collection fees.

**COUNT III**
**Breach of Contract (Common Law and the Virginia Uniform Computer
Information Transactions Act, Va. Code § 59.1-501, *et seq.*)**

68.     Carfax incorporates the allegations in paragraphs 1 through 66 as if set forth herein.

69.     Use of the myCARFAX service is governed by and subject to the contractual obligations in the Terms of Use (Exhibit F).  By registering for a myCARFAX account, a user agrees to the Terms of Use and its contractual obligations.  The Terms of Use and the requirement that a user agree therewith are both conspicuous and prominently placed.  The Terms of Use may be printed or stored for archival or review purposes.  A reasonable person accessing myCARFAX would have a reasonable and objective understanding that he or she was entering a contract by accepting the benefits of using myCARFAX.

70.     Defendants and their employees had the opportunity to review the Terms of Use pursuant to Va. Code §§ 59.1-501.13:1.

71.     Defendants and their employees have repeatedly and systemically created myCARFAX accounts to access vehicle history data and therefore manifested assent and agreement to the Terms of Use under the Virginia Uniform Computer Information Transactions Act ("UCITA"), Va. Code § 59.1-501.1, *et seq.*, and under common law.

72.     Upon information and belief, by taking steps to evade detection and myCARFAX's use limitations, Defendants and their employees have betrayed their knowledge of those limitations and the fact that the myCARFAX Terms of Use bar the commercial use of myCARFAX and its data.

73.     The Terms of Use impose legally enforceable obligations upon and are binding on Defendants and their employees.  Defendants are liable, in contract, under either or both of these theories of action:  First, Defendants' employees were acting within the scope of their employment

when accessing the myCARFAX services and doing so with the express, tacit, or implied authorization of Defendants.  Second, even if the employees' actions were not authorized by Defendants (which appears implausible), those actions nonetheless were within the scope of their employment and Defendants are deemed by law to have acquiesced in the making of these contracts for Defendants' benefit by accepting, retaining, and then profiting from the data obtained by their employees' unauthorized access of Carfax data through myCARFAX.

74.     Defendants have, as described above, willfully, repeatedly, and systemically breached the Terms of Use and its associated obligations.

75.     Carfax has performed all conditions, covenants, and promises required of it in accordance with the Terms of Use.

76.     Defendants' breach of the Terms of Use has damaged Carfax, causing and continuing to cause harm and damage to Carfax.

77.     Carfax is entitled to damages as a result of Defendants' breach of the Terms of Use.

78.     As a direct result of Defendants' actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## COUNT IV
### Computer Fraud and Computer Trespass (Virginia Computer Crimes Act, Va. Code § 18.2 – 152.1, *et seq.*)

79.     Carfax incorporates the allegations in paragraphs 1 through 77 as if set forth herein.

80.     In connection with its regular business operations, including the provision of online and internet-based services to consumers in Virginia and other states, Carfax maintains in Virginia

computers and computer networks that are "property" within the meaning of Va. Code § 18.2-152.2.

81.     Without authority, Defendants, through their employees who were acting within the scope of their employment, have repeatedly, systemically, and with malicious intent gained unauthorized access to Carfax's computer systems and data with the intent to obtain property and services under false pretenses by creating fictitious myCARFAX accounts.

82.     Without authority, Defendants have repeatedly, systemically, and with malicious intent gained unauthorized access to Carfax's computer systems and data in order to use Carfax's computers and computer network to make or cause to be made an unauthorized copy of Carfax's vehicle history data residing in, communicated by, and produced by Carfax's computer systems.

83.     The foregoing acts of Defendants have caused injury and damage to Carfax, Carfax's computer networks, and Carfax's reputation, including lost revenue.

84.     As a direct result of Defendants' actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

## COUNT V
### Unjust Enrichment

85.     Carfax incorporates the allegations in paragraphs 1 through 81 as if set forth herein.

86.     Defendants have derived benefit, including commercial advantage and private financial gain, from their willful and unauthorized access, use, and copying of Carfax's proprietary data.

87.     Defendants had an appreciation and knowledge of the benefit they derived from its unauthorized access, use, and copying of Carfax's proprietary data, as well as the activities alleged herein.

88.     Since 2005, one or more of the Defendants have purchased Carfax vehicle history data and have been aware of its value, particularly within the automotive and repossession industries.  Skip-tracers like Defendants routinely purchase vehicle history data from Carfax.  The repeated unauthorized access by Defendants over many years to evade paying for that data also demonstrates the great value that Defendants realized by their unauthorized access and use of Carfax vehicle history data through myCARFAX.

89.     Defendants have accepted and retained the benefits of its unauthorized access, use, and copying of Carfax's proprietary data under circumstances which render it inequitable for Defendants to retain those benefits without payment to Carfax or any other exchange of value.

90.     As a result of the conduct set forth above, Defendants have been unjustly enriched by the receipt and appreciation of benefits resulting from the unauthorized access.

91.     Defendants' unauthorized access, use, and copying of Carfax's proprietary data have damaged Carfax in an amount to be proven at trial.

92.     As a direct result of Defendants' actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## COUNT VI
### Trespass to Chattels

93.     Carfax incorporates the allegations in paragraphs 1 through 89 as if set forth herein.

94.     Defendants repeatedly, systemically, and intentionally gained unauthorized access to Carfax's proprietary data by creating fictitious myCARFAX accounts.  In so doing, Defendants

24

and their employees engaged in an improper intrusion into Carfax's computer systems and databases without the authorization of Carfax.

95.     Defendants' acts of trespass have been undertaken intentionally with malice, oppression, and fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants and others from engaging in similar conduct.

96.     Defendants' intentional use of and intermeddling with Carfax's proprietary data through myCARFAX impaired the value of the proprietary information and allowed Defendants to improperly exploit the information for pecuniary gain.  Defendants' actions diminished the value of Carfax's possessory interest in its computer systems and data.

97.     Defendants' actions have caused injury to Carfax and imposed costs on Carfax including time, money, reputation, and a burden on Carfax's computer systems.  As a result of Defendants' unauthorized and intentional conduct, Carfax has been damaged in an amount to be proven at trial.

98.     As a direct result of Defendants' actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief:

1.     An injunction barring Defendants and its officers, directors, principals, servants, employees, agents, successors, and assigns, and all persons and entities in active concert or participation with them, from accessing Carfax data through the myCARFAX service.

2.     Judgment in favor of Carfax and against Defendants for money damages under each count.

3.     Prejudgment interest allowable by law.

4.     Punitive damages.

5. Attorney's fees, costs, and expenses.

6. Such other relief as the Court deems just and reasonable.

Dated: May 12, 2020                          Respectfully submitted,

                                             CARFAX, INC.

                                             /s/ Craig C. Reilly
Sarah W. Sigurdson (Va. Bar No. 94479)       Craig C. Reilly VSB # 20942
Carfax, Inc.                                 111 Oronoco Street
5860 Trinity Pkwy., Suite 600                Alexandria, Virginia 22314
Centreville, VA 20120                        T: (703) 549-5354
Telephone: (703) 934-2664                    F: (703) 549-5355
Facsimile: (703) 995-4664                    E: craig.reilly@ccreillylaw.com
E-mail: SarahSigurdson@carfax.com

*Counsel for Plaintiff*                      *Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2020, a true copy of the foregoing pleading or paper was filed through the Court's CM/ECF system, which served a copy on all counsel registered in this action.

                                             /s/ Craig C. Reilly
                                             Craig C. Reilly VSB # 20942
                                             111 Oronoco Street
                                             Alexandria, Virginia 22314
                                             T: (703) 549-5354
                                             F: (703) 549-5355
                                             E: craig.reilly@ccreillylaw.com
                                             *Counsel for Plaintiff*